The next case today is Myesha Emmanuelle v. Handy Technologies, Inc. Appeal number 201378. Attorney Liz Reardon, please introduce yourself on the record for us. Good morning, Your Honors. This is Shannon Liz Reardon. I represent the plaintiff in this case. May I reserve three minutes for rebuttal? Yes, you may. Thank you. So, Your Honors, this case raises an extremely important issue that is confronting courts repeatedly these days as more and more companies are attempting to bind consumers and workers through online contracts. We urged in this case that the court consider certifying the case to the Massachusetts Supreme Judicial Court because it had not yet ruled on what constitutes an enforceable online contract, but as the court is aware, the SJC did just rule earlier this month in Cotter's v. Uber, and we believe that the decision in Cotter's reinforces the arguments that we've made here on this appeal and compel a reversal below. What the Cotter's court made clear is that Massachusetts has adopted, like many courts around the country, a two-part standard that the party seeking to enforce the agreement, the online agreement, has the burden of proving two parts. First, that the agreement was reasonably communicated and also that there was reasonable acceptance. It's very clear from the decision that both prongs must be met. The focus here by the district court was that the plaintiff conceded at trial that she had clicked on a box, thus satisfying the second part of the test, the reasonable manifestation of assent. But it's very clear from the Cotter's decision that both are required, and we submit that the first one, the first prong of reasonable communication was not met. And if you look at what the court focused on in Cotter's, and also the fact that the Cotter's court very frequently referred to and approvingly cited the Seventh Circuit case of Seguros, which we cited throughout our brief, I think makes clear that a reversal is compelled here. So going through the factors, the court made clear that determining whether or not there was reasonable communication of terms of an online contract requires a totality of the circumstances view. Here, what happened was that there was an interface that did not make clear to the user, in this case, the plaintiff, Maisha Manuel, that she was agreeing to a contract that contained an arbitration clause. So in the Cotter's case, the court asked the question, first, take a look at the interface. Does the interface require the user to open the terms that she is allegedly agreeing to or make them readily available? The court in Cotter's noted that click wrap agreements are regularly enforced, but didn't say that they are always enforced. So the court below really focused on the fact that there was a click here, that there was a box that she had to click saying that she agreed to terms, and that that was the end of the story. Am I right that by the time she has to click that acceptance box, something showing at least partially the agreement, and in a form that would suggest there's more to it, does pop up? No, no, that's not correct. So on the box, if you look at the screen that she used to sign up, first of all, it's a cluttered screen that asks for a lot of information, her name, her address, her T-shirt size, whether she has previous cleaning experience, et cetera. And then at the very bottom, the main click on that screen is a click saying continue to the next page, but just above it, there's this little tiny box that says I agree to terms of service. No, no, I'm not talking about the terms of service. On the mobile app, when she does accept, prior to her clicking that accept, I thought on her screen will appear a portion of the contract, not all of it, actually just the beginning part of it, in a way that would suggest there's more below it. Correct? Okay, no. So on that, on the phone app, there are these bullet points to confirm. I know there's that, but just answer my question. She clicks accept. Prior to doing that, on the mobile app, will a portion of the contract appear on her screen before she clicks accept, without her being able to stop that from happening? Yes. Okay. With respect to that, there is a line in the Cotter's opinion that I have a little trouble making sense of, which you quote in your brief, and it says, the interface did not require the user to scroll through the conditions or even select them. One way to read that is that the Cotter's case might be suggesting that there's a problem if you don't require scrolling. The employer doesn't require scrolling, which I can see the logic of that. It's not clear to me that that's what Cotter's is saying. You seem to be suggesting that Cotter's, that that sentence is important, so could you just comment what we're supposed to do with that aspect of it, and then I want to ask you a couple questions of the record regarding the scrolling issue. Sure. So, right. Cotter's talks about the issue about a company not requiring scrolling, and I agree that that line you're pointing to is a little ambiguous, but I'll point you back to the fact that Cotter's repeatedly cites the Seguro's decision from the Seventh Circuit. In the Seguro's case, the court, where the user did click something that said, I accept, the court decided that that wasn't enough because they didn't require scrolling, and if there had been scrolling, the arbitration clause was buried deep within it, which is the same. Counsel, I thought in that case it wasn't just a matter of scrolling, but that they never showed the terms and conditions to the drivers. This case is quite different because, as Judge Barron has pointed out, and I agree, that the screen where she has to accept the terms of the new agreement, she has shown the first two paragraphs of the agreement, and she has the ability to scroll down. She chooses not to scroll down, and in her deposition, she says, more or less, I wasn't interested in that, and therefore, I didn't scroll down. Could you please tell us why that doesn't dispose of this case against you? Yes. So, again, this is a similar situation to Seguro's. Four minutes remaining. Okay. The Seguro's, the plaintiff could have scrolled, but didn't. Yes, I'm sorry. I was referring to Singh, the District of New Jersey opinion, which the SJC cites with approval. Okay. So, here, the fact that the plaintiff said, I wasn't interested in doing it, doesn't mean that she realized that she could have scrolled, but just simply chose not to. There are no scroll bars here, so there was nothing indicating that scrolling could be an option. No, no. They ask her, did you scroll Exhibit 3, and she says, yes, I believe I did, in her disposition testimony. Am I wrong about that? I'm sorry. I would have to check that. Maybe I can come back on rebuttal to say that. Okay. But, again, I think she's saying that with respect to, there's three different agreements, right, three different points in time. It says to the last one of the three, and I don't know quite what to make of that fact as to how that relates to the other two, but the arbitration agreement purports to be retroactive, so I don't know. So, the third time, remember, she wasn't actually entering a contract. She was just trying to log in to get her personal information. So, she did not enter a contract that third time? Correct. I see. So, with respect to the only agreements that are in question, there's no evidence that she actually scrolled. I believe that's correct. Okay. Okay. And, again, there's the reasonableness. Excuse me. I'd just like to pursue that. Are you saying she did scroll in other areas, she didn't scroll as to the terms and conditions, and that the scrolling mechanism was different between the two? I don't believe the scrolling mechanism was different. The scrolling was not apparent that you could scroll. But, nonetheless, she found it on your accounting of the facts where she wanted to find it. Well, this was the third time. This was after she had decided to end her relationship with the company, so she wasn't entering a contract. She was just going back, and then she was looking a little more closely because she wanted to figure out what was going on here and get her personal information. Just so I understand, the timing of it would matter for whether she had actual notice at the time of the earlier contracts. You're not disputing that she could have scrolled all along. You're just saying that there was no requirement to scroll, and that might bear on whether the reasonable presentation of the term standard of COTTRS was met. Right. She could have scrolled, but it wasn't reasonable to expect her to understand she could have scrolled because there were no scroll bars. What do you mean by a scroll bar? Usually, when you can scroll on a document, there's an indication on the right-hand side. This is standard in online interfaces that one can press on it in order to scroll up and down. There was nothing like that here. I wish every online thing I had to look at had those scroll bars, but very often they're not. You go to the side and you use your cursor and you scroll down. In any event, the scrolling mechanism, you say, was the same for later when she chose to actually scroll down. What difference does it make that she was presented with the first two paragraphs of the terms and conditions and those were just flatly presented to her? She didn't need to scroll down to see those. Well, again, I think this is very similar to the Segoras case where, again, the plaintiff said, I accept the pertinent terms were buried very deep within it. The company clearly set this up not to make it appear. In the Segoras case, before she accepted, or he, whoever the employee was there, or the contracting party, before acceptance, did a partial presentation of the terms of the contract appear so that it would have been evident there was a contract with terms or not? I believe so. I'm looking at the Segoras case and where it talks about where the user could click and say, I accept. It says, nowhere did the button require him first to click on the scroll box. It seems to indicate that the first part of the text was showing up. I forget, does Cotter's rely on Segoras? Yes, Cotter's cites to it approvingly multiple times. Counselor, one point that Cotter's makes is that somebody who is trying to sign up for a service like Uber wouldn't necessarily think that they're, in essence, signing away their firstborn child. It seems to me to be a little bit different in a situation like this because, generally, when you enter into an employee-employer relationship, it's a different kind of relationship and people would have an expectation that there has to be some kinds of terms and conditions. Well, it's interesting because Handy, of course, denies that this was an employment relationship. It claims that plaintiff was also a user, a consumer of, essentially, it claims it was a matching service to match her up with cleaning jobs. I think it's also important that the Cotter's did cite to, I believe it was Segoras again, talking about how we can't just assume that ordinary consumers realize that they're entering into a binding legal contract even when there are terms used such as terms of service. We can't just assume that ordinary people understand terms of service means a contract, in this case, for how you would resolve legal disputes if you started to perform work for this company. Again, remember that the initial website she signed up for, she hadn't even started working. She hadn't even been accepted. They were asking her things like, do you have prior experience? What's your T-shirt size? So terms of service is, in a sense, a term of art that lay people shouldn't necessarily be assumed to understand they're entering into a binding legal contract about how to resolve disputes. That would be true by the time you get to the mobile app when there's acceptance following a presentation of the agreement. Right, and then on the mobile app, it was even further buried because the arbitration clause was 35 scrolls in. There was nothing at the top. It could have had something at the top. So just so I'm clear, you read Segoras to suggest that a requirement to scroll prior to acceptance is a precondition for it being a valid contract? Well, both cases really stand for, Cotter's and Segoras stand for the proposition that you look at the totality of the… I know that. I'm just asking about scrolling. Are you saying Segoras holds and is there any case anywhere that holds that in the online world? I mean, I could see why you might have that rule, but is there any case that holds that there is a requirement to prompt the person entering into the contract to scroll first prior to acceptance rather than to just give them a little bit of pretty anodyne language, then have an accept button, which would be pretty tempting to move right to? I think Cotter's comes pretty close to that, and again, it emphasizes totality of the circumstances, but given its emphasis on that and its frequent citations to Segoras, I think one could say that unless there are other countervening factors that make it overwhelmingly more visible, without that requirement of scrolling, it would be very hard to enforce an online… May I pursue that? Yes. There are actually different ways of approaching it. Judge Barron asked whether a prompt to scroll is a necessary precondition. A prompt, of course, the reader can decide, I'm not going to follow that prompt. I thought your argument was you had to be required to scroll before you accept. So, which are you arguing? Well, I'm saying I don't think there are necessarily hard and fast rules. There are different things that companies can do that would prompt someone to scroll. You could either say, please scroll and review before clicking, or there's a way that you've seen… And presenting the first two paragraphs is not adequate. No, no. If it's not even clear that you can scroll because there are no scroll bars, and there are also ways that there are some contracts where you actually do have to scroll down to the bottom and you can't click I accept until you actually do that. And here, also, just another point to compare this to Cotter's. Remember, it's not that the most… In this case, the most obvious click at the bottom was not the click saying I hereby accept this, or I accept terms of service. The I accept terms of service was a little click box above the much bigger button that said, continue. So, again, there is focus in Cotter's on where is the user's attention directed. If the important thing here was accepting a binding legal contract, why wasn't that the thing that had to be clicked that was in a large box? Why was there just a tiny little check box, and then the bigger click was continue, move on to the next page. We're going to ask you some more questions. I feel like this all goes into the totality of circumstances inquiry. Before you leave us, could you just please clarify, because it wasn't clear to me what your answer was in response to Judge Lynch's question about her deposition testimony, that she wasn't really concerned. I mean, I guess the question for us is, is this a unique case where the litigant has made that kind of sort of damaging statement versus a situation where someone just says I wasn't really aware as opposed to I don't care? I really don't think there's a difference here just because she was obviously upset and frustrated with the company and said I didn't want to look at what they had to say. I don't think that goes to the question of the reasonableness of what was presented to her, and I believe the testimony that Judge Lynch was referring to was after her third time. That was the point when she was upset with the company. She wasn't entering into an agreement to continue doing any work for the company. She was just trying to get back into her online profile so that she could get her personal information about the work she had done. So you're saying at trial she did not make a concession as to her first two entries into their website that she didn't care? I don't believe so. I thought that was related, her comment related to her third time going in. Can I ask you one last question? What is your understanding of the significance both in terms of why it's there and then how it might bear on any of the issues relating to contract formation of that term that says I am an independent contractor? I don't fully understand what that's doing. Does that potentially have some legal weight in the question of whether you're an employee or not, if you say that? Relatedly, you mentioned that the company here was taking the position that your client is not even an independent contractor of them? So the company takes the position that she's an independent contractor, not an employee. Of whom? Of Handy. Of Handy, okay. So you're not saying that they're taking the position that this is just a service for like a user or a matcher. They take the view that this person was entering into a contract with them as an independent contractor. Yes, right. But this company, like other similar companies, claim that the workers as well as the customers are all customers. They're all customers of this matchmaking interface. Well, I'm just trying to figure out, does that matter for how we analyze it? In light of Cotter's was, as Judge Thompson was saying, clearly a non-work related setting. Is the nature of this circumstance by virtue of Handy taking the position that they're all customers somehow relevant to that part of the inquiry? Well, I think it undermines Handy's argument that she should have been more on notice or would have been prompted to be more discerning of what was on the website because she was entering a work employment relationship. Essentially is what Handy's saying. Handy's, in the whole case, denying that she, like other cleaners, were entering any such type of employment agreement through which such terms would be. Aren't we slicing and dicing? Handy is signifying explicitly that they view the employment relationship as an independent contractor relationship as opposed to an employee-employer relationship. Right. And so in so doing, they claim. And you're saying that that is undercut by their use of the term customers? I'm just saying that it undermines. I don't really know how significant this point is, but it undermines their point that when someone is entering, for example, an employment relationship, they might be more on, let's say, inquiry notice that they should be fully studying every aspect of the online sign-up process to understand what the terms of that relationship would be. I'm just saying that it doesn't really make much sense for them to claim that she's in a different circumstance from a consumer, for instance, in Cotter's. Thank you. Thank you. Got it. Thank you. Attorney Lissreden, you can mute your device at this time. And Attorney Mankus, if you could unmute your device and introduce yourself on the record. Good morning. May it please the court, my name is Michael Mankus, and I represent Handy Technologies, Inc. As my sister mentioned, we were fortunate in timing in this case because we had the SJC decision within the last month in Cotter's, which articulated Massachusetts law when it comes to the formation of online contracts and the enforceability of online contracts. And that decision and the standard articulated by the court in that decision was nearly identical to the standard articulated by this court in Cullinane. And the court cited favorably to Cullinane, and it also cited favorably even to the district court decision in this case. But there are three, I think, key takeaways from the Cotter's case that apply directly here. One is that the court was clear that while reasonable notice of the agreement is required, conspicuous notice is not. So they said the standard is slightly less than conspicuous notice. It's just reasonable. And they don't explain what that is, what the difference is. We know it's something less than conspicuous. Secondly, they say that actual notice of the agreement is enough. And if there's actual notice that these terms exist and the individual has had an opportunity to review those terms, then that's the end of the inquiry. You don't look at how big the font is or what color the font is or how busy the page was. They just say it was actual notice. That's it. And it's only when there's not actual notice that you start looking into all these other details of the page into how the terms of use, like, for example, in this situation was displayed and whether someone could easily miss it. And they looked at some Uber cases where the terms of use were on the bottom of the page just as a hyperlink without any checkbox. And a user can actually go and go on to the next page without even getting to the bottom of that page or not even seeing terms of use. But counselor, I'm sorry, just to interrupt you. The court said that actual notice will exist where the user has reviewed the terms. And it says it will also generally be found where the user must somehow interact with the terms before agreeing to them. So it's putting an onus on the person drafting this contract to make sure that the terms are at least reasonably noticed so that someone can find them. Yes, and what the Cotters also did in that respect was they clarified what they meant by that because they then applied that term to the CLICRAP agreement. So we're not even getting yet to the SCROLLRAP agreement where the actual contract is on the screen in front of the user. We're starting first with the CLICRAP agreement because that's what the Cotters court addresses. And the Cotters court is looking specifically at CLICRAP agreements. And that's where the I agree to terms of use or I agree to this contract has a checkbox next to it. Yeah, but you just changed it. You just changed it. I agree to this contract. It's different than I agree to the terms of use. Well, I'm saying the cases that it relies on, it relies on a variety of cases and different cases use different language. Just so I take this argument, I don't mean to if you have more to say about it, go ahead. But just so you get my question, if I wasn't taking the Cotters tells us that that terms of use part is itself dispositive of the case, so we don't even have to get to the mobile app issue. And if we did have to get to the mobile app issue, I do want you to address this language that I asked your opponent about where the SJC says the interface did not require the user to scroll through the conditions or even select them. But that sentence seems to be hard to square with the idea that Cotters is clearly saying it's enough to present the first few lines of an agreement without requiring scrolling. Well, Cotters says so there are a couple of different lines from Cotters, and I think they obviously need to be read together to understand what the Cotters court is saying. But it says, does the interface require the user to open the terms? And I would say that would mean also scrolling through because it's opening the terms or and then there's an or does it make them readily available? And I would say that based on Cotters and their discussion of click wrap agreements, and then I think scroll wrap agreements are obviously even more obvious to the user as to there's an agreement. The thing is that I just have trouble reading the opinion as you're suggesting it because there's just no reason for them to mention the fact that it did not require them to scroll through or even select them. If just making it evident that there is a contract is enough. Clearly they did make evident that there was a contract because some of the terms were some of the parts of the contract were presented. But if that's enough, why is the SJC referencing scrolling? I don't know why they're referring. I can't read their minds. Doesn't that suggest since you don't know and I don't know, that's usually when we certify. Well, but here, but here, but there are other sets. I think there's clarification. When it came to that particular situation, they were referring to a case. Why a case? And I think it was the Segaris case. They were referring to a specific case and what happened in that particular case. That's what I'm so worried about. In Segaris, if your opponent's right, one of the things that concerned the court there was the absence of a requirement to scroll. Actually, I think that is a misreading of Segaris. Segaris, and I will say there are a couple of other, we can get to this after. There are a couple of other statements in Cotter's where Cotter's, I think the court says it's clear that they don't have to actually show the user the terms. It says ultimately the offeror must reasonably notify the user that there are terms to which the user will be bound and give the user the opportunity to review those terms. But if you look at Segaris, and Segaris, I do think Segaris was taken out of context by my sister. If you look at page 1035 in Segaris, Segaris was not concerned about the lack of scrolling. Segaris' big concern was, it says, I'm quoting from the case, the hyperlinked version of the service agreement was not labeled terms of use or purchase or service agreement, but rather just printable version. So they were concerned, number one, that the hyperlink just said printable version and the hyperlink was not clear that it was terms of use. And then it said, but what cinches the case for Segaris is the fact that TransUnion site actively misleads the customer. The block of bold text below the scroll box told the user that clicking on the box constituted the authorization for TransUnion to obtain his personal information. So it wasn't that they didn't give the reader a chance to review the scroll box. What the court was concerned about in Segaris was the way the scroll box, what was in the scroll box was misleading enough that if someone was reading the scroll box, they would be misled into thinking the scroll box was simply the authorization for the company to obtain personal information. And it was this misleading issue in Segaris that led to that decision and why they thought that particular agreement in Segaris was not enforceable. But if you look outside Segaris, this is one case which deals with scrolling and they're very specific as to why the scrolling is an issue in that case given the wording of the terms in that case. There is not one other case, I mean there might be, but I've looked pretty exhaustively. I can't find any case where a scrolling agreement was found to be unenforceable because it just had the first few paragraphs. Or it didn't require someone to read through the entire scrolling agreement. And here, I know my sister makes much of the fact that there's no scrolling line on the right side of the screen. We have to remember this is on a smartphone. This is actually not on a computer. And I would say almost everyone who uses a smartphone understands the way that smartphones scroll. I mean anyone who's going to use a smartphone for purposes of providing cleaning services, for example, should be sophisticated enough that they've been to a website before. And if you go to CNN.com, for example, on your smartphone, there's no scrolling bar on the right. You know if the first paragraph or two of an article appears on your smartphone and you want to read the rest of it, what do you do? You use your finger and you swipe the phone up. It's that easy. Why do you make so salient this statement that I understand I am an independent contractor without making salient at that moment that questions about whether you are will be subject to arbitration? I mean there's something that does seem a little tricky about that. It wouldn't be that hard to add into that thing where you want to make it so salient what the nature of the employment relationship is that you're going to nine pages down in the contract that you don't make visible unless you scroll and you don't tell them they have to scroll. At the end of all that, you're going to say, oh, by the way, that thing about whether you're an independent contractor, that can't go to court. I mean, I just don't get that. Why not just make that evident that's going to have to be arbitrated? Well, Your Honor, terms of use is one and the other one is an independent contractor agreement. I actually think if you look at any types of agreements like this, even in the commercial world, any type of agreement, typically an agreement between a user and a company is going to – the thing that most users are going to be interested in initially is how does this app work? How do I use it? How can I be introduced to potential customers or clients? How do I get paid? How do I contest my pay? How do I record what I'm doing? For most people when they start up in a relationship, those are the terms. And then even if you look at a commercial agreement, when it comes to, okay, are there disputes about what happens, those are usually at the end of a contract just like they are if you buy a new TV or a new car. The first 20 pages tell you how to use the TV or how to use the car. At the end, there's troubleshooting. What happens if you have issues? How does that work? And I think that is typical for most agreements because at the end of the day, most users when they sign up to use an app want to know how they can use the app and how the app works. What I don't understand is – I mean I have my iPad up next to my computer here. When I signed up for the weather app, for the dictionary, for any of the apps that I have pulled up, they all have terms of use. I mean that's the language they use, which makes me think it's the terms related to using the app itself. It seems odd to me that that is the expression when you're entering into some kind of employment situation, be it as an independent contractor or as a straight employee. It seems particularly confusing when you actually have to go to a face-to-face gathering where information is presented, but something like the terms of your independent contractor is not presented at least in that face-to-face meeting. Well, on online contracts, terms of use – so this situation is where someone wants to use the handy app in order to connect themselves with customers. We're talking about in this particular setting. So terms of use is everything that applies to that relationship. And again, I'm not aware of any cases that have issues with the terms of use. Now, there are a couple of cases, and my sister points them in her brief, where terms of service is viewed as an issue, and sometimes it's contrasted with terms of use. And I could see why particularly in the customer setting. So for example, in a situation where let's say you sign up for Uber as someone who wants to use an Uber driver to go from point A to B, terms of service is different because the term service arguably applies to the service that Uber through its app is providing to you. You might say, well, I know how Uber works. I've heard about it from friends and family. I don't need to understand the service better. But terms of use is different. I would say, and I think the cases treat terms of use as different. Terms of use is the use of the app and all the practices and policies that apply to your use of the app for this particular purpose. When do you actually enter into the independent contractor relationship as the worker in this situation? Isn't it only when somebody also uses it to connect with you so that you then do the cleaning? So it could be, but you're presenting yourself as an independent contractor. I understand that, but I'm saying that there's at least two dimensions to it. There's the use of the platform that Handy's created. And then there's doing the work through that platform. It's only in the doing the work through that platform that you become an independent contractor. You're not an independent contractor just by using the platform. Well, you're presenting yourself. At that point, you're not an independent contractor. You're not an independent contractor relationship when you're just using the platform presenting yourself. Yes, I would say, for example, it's like holding yourself out. Let's say you decided to start your own company as an independent contractor. You're going to offer your services without the use of Handy's platform or any other platform. You just decide, I'm going to create a site. Until somebody accepts my services or my labor, I'm not in a contractual relationship with that person. You would not be for purposes of your relationship. I think to Judge Thompson's point, that's what's a little confusing here is that use could be use of the platform. Yes, so that's what it does apply to. So you have two things here. There's no claim that you can have under Felicity for just using the platform of holding yourself out. It's the payment. Maybe I'm misunderstanding. I don't think you can get paid just by holding yourself out. No, so the terms of use relates to the terms of using the platform. So you don't have to be – it's not really about, at that point, being an independent contractor. Now, the terms of use say that once you perform work, just making clear to the person, the user… That's what gives rise, I think, to the ambiguity about whether terms of use is enough to suggest that you're entering into the employment contract or the independent contractor contract. Well, and there are two contracts here, right? Okay, well, that gets to the second. That's why the app might matter a lot. Yes, so then the app is the – yes, then you have the actual independent contractor agreement that the individual, and that's the one that's scrolling, where the user then has to actually sign that they agree to the independent contract agreement before actually using the app. Will said I could. It was just one thing that I wanted to clarify because it answers one of the questions that came up. It was with regard to the second agreement. At the time that the appellant signed up for the app, she said that I did not read the agreement because I didn't care what it said. It was not the third agreement later. It was the second agreement. Yes, but at that point, she's not testifying that she scrolled. No, she's saying that she saw the scrolling screen, and when I asked her why didn't you scroll and read through it, it wasn't that I didn't know it scrolled. She said because I didn't care what it said. Yeah, but I guess I'm not – if there was a requirement to prompt someone to scroll, are you saying she had actual notice of the fact that you could scroll and that's enough? Yes, because if you look at Cotter's, you don't even have to have a scrolling box. But the reason that I think – one reason to have a scrolling requirement is because that would make your eyes pass over the salient term, which is underlined. She's not saying she ever did that. So there's two dimensions to it. In the later testimony with respect to the third situation, she actually says, I scrolled, but she's not in an agreement there. In the second one, she just says, I didn't want to see what they said, so I didn't scroll. So she definitely had notice you could scroll, but that's just different than whether there's a requirement to make you scroll so that your eyes would have to pass over things. So that's where Cotter's comes in because Cotter's says essentially implicit in Cotter's is that you don't have to make someone read the agreement. You have to give them the reasonable opportunity to review the terms. And then she's an adult as are other people who have to use the app, and then they make the decision, am I going to decide to review this or not? Is this important to me to review? But Cotter's – that's one thing Cotter's I think does make clear. It says give the user the opportunity to review those terms. Make them readily available. And so I would say regardless of how we think as a public policy, how a person is more likely to read the terms, whether you force them to or not, that's just not something that Massachusetts law requires. It just requires that you give them the opportunity to review the terms, and whether you actually review them is up to them. And just one last pass at that. Then that phrase that I quoted to you from Cotter's where it says the interface did not require the user to scroll or even select the terms, how does that square with what you're saying? I just find that sentence hard to match with this because it seems like an unnecessary thing to have said if what you're saying is true, which is it's enough to know you can scroll. They say the interface did not require you to scroll. So it's – when they actually set forth the standard, they don't use that phrase. And actually they talk favorably about the Singh v. Uber case, which was just a click wrap and didn't even have a scrolling text. They only – when they use the phrase, Judge Barron, that you're referring to, it's just simply in summarizing how the court held in another case. It wasn't necessarily setting forth the standard that the court was articulating here. Can I just ask one more question, Judge Lynch? Yes. In Cotter's, do you think that the SJC has said all that needs to be said on these agreements? In other words, is there any value in certifying this particular case? Well, I would say not this particular case. I mean there may be obviously other questions that come up in unique circumstances. But when I read Cotter's, I see it as essentially endorsing the click wrap agreement, which we have here in the terms of use. And here – so you don't even need scrolling. I mean click wrap is obviously a step short of having the paragraphs on the screen. And if the court, through its favorable opinion of or reference to Singh v. Uber, is saying a click wrap agreement where the person is only presented with a hyperlink and not presented with any part of the agreement is sufficient. Well, here we have now paragraphs on a screen. So now, Handy has gone one step beyond what the court said is necessary in Cotter's. And if you look at all the cases, the cases my sister cites, the cases that Cotter's relies on, they're talking about click wrap agreements where the user actually sees none of the agreement on their screen, just the hyperlink. And all these cases are saying that's enough. Does the panel have any further questions? I'm good.  Thank you, Your Honors. Mr. Mankus, you can mute your device at this time. Attorney Lis Reardon, you have three minutes of rebuttal. Please reintroduce yourself for the record. Thank you. Shannon Lis Reardon for the plaintiff appellant. I'm looking at the Cotter's case right now, and the discussion of Singh talks about how, in that case, the Uber app carefully required drivers to consider the terms and conditions. So that's not the same situation we have here. And I believe that the discussion of Singh was focused on the way that the user accepted. And here, of course, our focus is not on whether there was reasonable acceptance but whether there was reasonable notice. But could you just answer the last point that was made about the click wrap agreements? I mean, if Cotter's endorses a click wrap agreement, how could it be plausibly read to require scrolling? Well, so, again, there are two steps to the analysis. There's the reasonable communication, step one, and then there's the reasonable manifest consent. But I'm just saying, if it ever allows a click wrap agreement, there won't be any presentation of terms in a click wrap agreement, will there? There won't be any presentation of terms in a click wrap agreement. The click wrap simply goes to the second part, the manifestation of this. Yeah, but if they allow that contract to exist and to count and then to bind you to the terms which you didn't see before the click, how could it be read to be saying, oh, but also you have to have scrolling? Maybe I'm missing something. I'm just not seeing how to put those two points together. I think the scrolling part goes to the reasonable notice step one. Yeah, but where's the reasonable notice in a click wrap agreement? Well, in a click wrap agreement, you have to have reasonable notice and you have to have reasonable assent. What I'm saying is the click wrap may give you the assent, but it doesn't give you the notice necessarily. In a click wrap agreement, where does the notice come from? Well, there needs to have been reasonable notice first. So, I'm saying in cases in which they've upheld click wrap agreements and found them binding. Yes. What are the types of ways in which the notice was communicated of terms in those click wrap agreements prior to acceptance? Well, so there needed to be something reasonable such as it appearing on the screen or scrolling that was either required. Well, I mean, as you pointed out, Judge Barron, Cotter's is a little ambiguous on this, but it does its focus on the scrolling and how that agreement didn't require the user to scroll. Do I hear you saying that it'd be hard to reconcile endorsing click wrap agreements and requiring scrolling? Those two things are at odds with one another, right? No, no, because I think the click wrap goes to the acceptance step two and scrolling goes to the notice step one. So, in other words, in the click wrap, if the screen says there are additional terms and conditions that will be binding on you, whether you read them or not, that's reasonable presentation, reasonable notice, right? Well, again, under the totality of the circumstances, it depends. In Segoras, I'm just looking at the Segoras decision again, it was visible to the user that they were clicking on something that's called service agreement. But if it says service agreement with binding terms. Well, it didn't say that here. And I do think there are a lot of ambiguities here. Certification may be warranted because there are obviously still unanswered questions as we are all trying to sort out what Cotter's meant exactly. Exactly. What issue would you certify whether it is whether the website mandates that you scroll? Is that the issue that we would certify on your theory? I think a little more clarification would be useful as to what constitutes reasonable notice. Well, your brother has said the language which troubles Judge Barron shouldn't trouble him for two reasons. One, it was merely a description of another case. But secondly, it cannot possibly import such an agreement because the discussion of the standards is there was a reasonable opportunity to view the terms. And at that point, there is no suggestion and counters of the necessity of scrolling. So you're just saying generally it would help if the SJC would look at another set of facts and parse through those? I think that the SJC and Cotter's did make note of an agreement that did not require the user to scroll or select terms. And that is meaningful. That's more than just noting what happened in another case. And again, it refers repeatedly and approvingly to Seguro's where the term. But in the recitation of its standards, it uses no such language. It talks about totality of the circumstances and throughout the decision, it discusses the issues that led it to the conclusion it did under its totality of the circumstances analysis. And I also just want to point out the record is a little ambiguous about when the plaintiff was referring to when she said, I didn't care about reading the agreement. I believe that my brother said that that related to the second time, but I think it's ambiguous whether she was referring to the second time or the third time. And again, I just want to highlight it wasn't it wasn't reasonable to necessary to. There's no reason to necessarily assume that she understood the second time that she could scroll or that she was agreeing to a binding contract regarding her actual performance of eventual work, which she wasn't entering into the contract to do the work just because she accepted entering into Handy's interface that second time. OK, thank you very much. Thank you, Your Honors. Thank you, Counsel. Attorney Liz Reardon and Attorney Mancus, you can leave the meeting at this time.